LOTTINGER, Judge.
This is a workmen’s compensation suit wherein the plaintiff, W. Jeff Hammett, seeks compensation for total permanent disability. The case was previously before this court on an exception of prematurity which we sustained. See 36 So.2d 280. On a writ of certiorari to the Supreme Court, however, our decision was reversed. See 216 La. 245, 43 So.2d 596. The case was then tried on the merits and the plaintiff is now appealing from a judgment of the lower court which dismissed his suit.
The injury upon which plaintiff bases his cause of action occurred on July 2, 1946, when he struck his left knee on a bolt which protruded from a ladder which he was descending. There is no dispute as to his employment, the happening of the accident, or his rate of pay. The sole and only question raised is one of fact, namely, whether the plaintiff was rendered totally and permanently disabled as a result of the aforesaid accident. The plaintiff was employed in the capacity of a supervisor of a filling station by the defendant. He had to attend to the supervision of inspection of tires and the lubrication and washing and the filling with gasoline of cars. He likewise had to gauge the tanks and see that the tanks were full. He had two helpers to assist him in doing this work. His duties were equal to that of a supervisor of a filling station.
*332 It is clear from the testimony of the plaintiff himself that the blow he received was mot a hard one and that his knee hit the bolt while he was descending the ladder. According to the testimony of Dr. Lacour, who was employed by the defendant company and who examined the plaintiff after the accident, the only external sign of injury was a slight bruise. The plaintiff’s cause of action, however, does not rest solely upon the injury of July 2, but is predicated on this injury having aggravated a dormant arthritic condition which had previously existed for several years. The plaintiff now complains that his knee is disabled to such an extent that he can no longer climb or do labor which requires the use of his legs and that consequently he is totally and permanently disabled within the meaning of our Workmen’s Compensation Act, LSA-RS 23:1021 et seq. It is, of course, well settled in this state that aggravation or activation of a previously weakened portion of the body gives rise to a claim for compensation.
The record discloses that the plaintiff underwent two operations on the knee in question, one on August 5, 1943, and the other on November 13, 1943. These operations were performed by a Dr. Durham of Shreveport, who later died in March 1946, who in each operation removed the semi-lunar cartilage from the knee. It appears that these operations were necessary because of an injury received some time previous. Much testimony was adduced as to the condition of plaintiff’s knee subsequent to these operations and prior to the injury of July 2, 1946. However, from the view which we take of the case whether or not plaintiff had 'fully recovered is of not too much importance.
Assuming that the plaintiff is presently disabled as he claims, he still bears the burden of proving his disability to be the result of the accident which occurred while in defendant’s employ. The minutes of the District Court show the findings of the trial judge to be as follows: “For oral reasons assigned, the Court finds from the evidence in the case that plaintiff did suffer a slight injury. The court is also of the opinion that plaintiff 'has not proved that the injury received has aggravated the previous condition.”
We agree with the trial judge that the plaintiff did sustain a slight injury to his knee, and we further agree that the plaintiff has failed to prove the necessary connection between the accident, his previous condition and his condition today.
Dr. Taylor, an orthopedic surgeon and a witness for the plaintiff, testified that Mr. Hammett consulted him on January 29, 1945, at which time “He complained of soreness in the front of his left knee and on the outer side of the knee cap. He stated that the knee was uncomfortable at night and that he suffered muscle cramps.” It will be remembered that this visit was subsequent to the operations performed in 1943 and prior to the injury forming the basis of this suit. Apparently the next time the plaintiff visited Dr. Taylor was on May 15, 1947, at which time he x-rayed plaintiff and found no arthritis. While there is a good deal of testimony in the record by this doctor, we think it can fairly be stated that in substance he testified that it is questionable that the removal of the cartilages had rendered the knee more susceptible to re-injury, that plaintiff could have had arthritis in 1945, that the arthritic condition could have been caused by the inflammatory condition of the cartilages prior to their removal, that the operations could have contributed to the arthritis, and that if plaintiff received a minor injury, the contribution to his existing condition would be minor also.
Dr. Garrett, who also testified for the plaintiff, testified that he was of the opinion that if arthritis was present in 1946, the blow could have aggravated it. He also stated that some authorities are of the opinion that trauma can cause arthritis, but that he had no way of knowing if such is the cause of plaintiff’s arthritis.
Dr. Riley, a radiologist, took x-rays of the plaintiff on April 22,1947, at the request of Dr. Garrett and found “moderate hyper-trophic arthritis”. He was of the opinion that this condition had existed at least for one year or more. He stated further that *333 he was unable to tell whether the arthritis was caused by trauma or whether trauma had aggravated it. This doctor took x-rays again in February 1950, and stated that he could not find where the condition of the knee had changed since 1947.
Turning now to the testimony of witnesses for the defendant, we find that Dr. Fritz Lacour, who was in charge of first aid and the medical department for the defendant in July 1946, stated that he found only a slight bruise after the accident which was not sufficient in his opinion to cause aggravation of an arthritic condition.
Dr. Stakely Hatchette, a radiologist, testified that he made pictures of plaintiff’s left knee in March 1950, and he stated that: “I was unable to find anything that I felt would be of any significance in this case. The man gave his age as being 54 years of age, and I did find a slight roughening on the anterior and posterior edges of the little ridge of bone that is located on top of the tibia — that is, the large bone in the leg, which falls between the two condyles of the femur and which acts more or less as a stabilizing influence on the knee. This, we find commonly in individuals of this age, even younger, and I felt it was of no clinical significance. I was unable to find anything else on the film which I thought could result in painful symptoms.” He further stated that his x-rays did not indicate arthritis and that there was nothing shown on the film which in his opinion would act as a disabling factor. He was further asked the question,
“Q. Could the condition of the joint that you found in this case, roughening of the surfaces there in the central part of the joint, have caused by a bump on the knee cap, a bruise on the knee cap suffered by Mr. Hammett on July 2, 1946? A. No sir, I don’t think it possibly could have been caused by that.
“Q. The condition you found you would not associate with any trauma suffered about that time ? A. The condition I found I associate with age.”
Dr. C. V. Hatchette, an orthopedic surgeon, stated that he
“was unable to find limitation of motion in this patient’s knee. The collateral ligaments were intact. The crucial ligaments were also intact. He showed two scars, one over the lateral joint space, and one over the medial joint space of the left knee which were apparently old and well-healed and they were not in any way connected with the underlying tissues. Both of the knees measured 14% inches in circumference. This measurement was made to compare the knee to determine swelling. The calves of both of his knees measured fourteen inches in circumference. Rotation of the joint did not cause undue pain, flexion and extension of the joint were good. Otherwise, the physical examination was essentially negative.
“The X-ray examination, as made by Dr. Stakely Hatchette, was confined to the left knee and this showed minimal hypertrophic arthritis. This was generalized about the joint. It was my opinion following this examination that Mr. Hammett could do the work of a filling station attendant and' a tire inspector. That was the work that he told me that he had done prior to his alleged injury, and I saw no reason from a physical examination or the X-ray examination why he could not do this type of work.
The Court: Doctor, there has been some testimony that he had to climb occasionally. What effect would that have on his ability to work? A. From my examination, I could not understand any reason why this man could not use his knee, more or less normally. The minimal hypertrophic changes that this patient had in his knee might under certain circumstances give him some vague pains in the 'joint, after terrific heavy work or barometric changes such as occur with changes of weather, but I cannot understand why a knee of this type could not be used very satisfactorily in ordinary work.
“Q. Doctor, could it be that he does have a mild hypertrophic arthritis that wouldn’t 'have shown clearly on the pictures? A. No.
“Q. It is your opinion, then after seeing the pictures that he couldn’t have hyper- *334 trophic arthritis and that the hypertrophic changes he has there are not sufficient to cause him any disability in the use of that leg? A. Yes, sir, and that any arthritis that this man has is shown in the X-ray film.
“Q. Sir? A. And any arthritis that this man has is shown in the X-ray film.
“Q. You failed to detect anything that would indicate a mild hypertrophic arthritis? A. I did find a mild hypertrophic arthritis.
“Q. You did find a mild hypertrophic arthritis? A. Yes.
“Q. Would you associate that condition with trauma? A. Some hypertrophic arthritis is gotten through disease, some of it is gotten through trauma. The general term, hypertrophic arthritis, is used, to describe conditions of overgrowth about the joint surface. This might be due to disease. There is another type which we describe as traumatic arthritis. Trauma can cause hypertrophic arthritis, yes, but when it is referred to I like to refer to it as traumatic arthritis.
“Q. Not hypertrophic arthritis? A. No’, sir, not unless I know the cause of the condition.
“Q. Now, it has been shown by the testimony of Mr. Hammett that he received a blow or bruise which was not sufficient to break the skin, to his knee on the inside of the knee cap, on the 2nd of July, 1946, Assuming that to be true, do you think that if he had a mild arthritic condition at that time that such a blow would be sufficient to aggravate that condition to the extent he would become permanently disabled in that joint? A. I wouldn’t think so. It is a very difficult question to answer in that Mr. Hammett stated to me that he waited five — or I believe it was five days — before he consulted a physician following this blow. I have only to suppose that if this blow was severe enough to 'have aggravated an existing arthritic condition that he would have found aggravation more quickly than five days. By that, I mean that he would have had enough pain in a knee joint to have consulted a physician before a five day period was up. For that reason I assume that the blow which he received was not sufficient to have caused arthritis.
“Q. It has been testified by Dr. LaCour that the blow that he got was only sufficient to cause a slight bruise, not causing any general swelling of the joint. It was localized in the bruised area. That being true, do you think that bruise could have caused any serious aggravation of any arthritic condition he might have had and resulted in any permanent disability of that joint? A. No, sir, and I predicate that answer on the fact that I don’t find any serious arthritis. I don’t find anything in the X-ray film to indicate he has serious arthritis.
“Q. Could the arthritic condition at his age have developed, and developed to the point it is without any trauma at all? A. Yes, with a man fifty-four years of age. We frequently see knees much worse than his with no history of trauma or disease. That is an individual thing.
“Q. Does the weight of the individual, Doctor, have anything to do with the progress of arthritis in such a joint as the knee joint? A. Yes, sir.
“Q. What would you estimate Mr. Hammett’s weight to be ? A. 185 pounds. I don’t know what his weight is. I should say Mr. Hammett is a medium large individual.”
This doctor’s testimony indicates that he did not think that the blow was sufficient to have caused arthritis and that the condition of arthritis existing could have developed without any trauma at ail.
The record in this case is lengthy and contains the testimony of several laymen in addition to the doctors mentioned above. Plaintiff’s brother-in-law, Mr. Turnbow, testified that plaintiff had trouble with his knee before he went to work for defendant. Mr. Bert S. Smith, an employee of defendant, likewise testified that plaintiff had complained to him on different occasions some three to six months prior to July 2, 1946, that his knee was bothering him and that it was too hard for him standing on his feet all day on the concrete and that he would *335 have to quit his job with defendant. It is likewise shown in the record that on July 12, 1946, the plaintiff requested termination and he gave as a reason for termination requested as “going to work for Arkansas Fuel Company in Shreveport, Louisiana”. It is likewise indicated that if the plaintiff was terminating his relationship with defendant for any other reason that said reason would have been placed on the employee change of status card. It is apparent from this that the plaintiff did not sever his relationship with the defendant on account of the alleged injury received on July 2, 1946. Another witness by the name of Mr. W. E. Bennett, likewise testified that he had had numerous conversations with the plaintiff some time prior to July 2, 1946, and that the plaintiff complained to him that he had had some trouble with his knee and had an operation performed and that it wasn’t entirely satisfactory and that it continued to bother him. The record indicates that even though this claimant received his injury on July 2, 1946, he continued to work throitghout that day, as well as on the 3rd. The 4th being a holiday, he did not work, but reported for work again and did work on the Sth. The 6th and 7th being a Saturday and Sunday, he did not work, but reported again for work on the 8th, 9th, 10th, 11th, and 12th, and according to his termination card, he ended his employment with defendant at 4:00 P.M., on July 12, 1946, for the reason that he was going to work in Shreveport, for another company.
It is our opinion that the plaintiff in order to recover must show to a legal certainty that the condition of which he presently complains was caused by the blow received while working for the defendant. A careful review of the medical testimony indicates to us that arthritis can be caused by a blow and that existing arthritis can be aggravated by a blow. The testimony insofar as this plaintiff is concerned, however, falls far short of showing either that the Iblow caused his condition, or aggravated a previously existing condition. In other words, the plaintiff, who like the plaintiff in any other civil suit, must establish his case by a preponderance of the testimony, has failed to establish his claim with that degree of certainty which the law requires.
For the reasons assigned, therefore, the judgment of the lower court is affirmed.
Judgment affirmed.